## JESSE CHANDLER and others *vs.* BENJAMIN FERRIS.

Sound and disposing mind and memory, what is it?
What degree of influence will vitiate a will.
If in drawing out a will from instructions they be materially departed from, the jury must be satisfied that the testator knew of the deviations
Testimony will not be admitted in reply which might have been adduced on the examination in chief.
The party which has the burthen of proof is entitled to the opening and conclusion,
On an issue of devisavit vel non the caveators have the onus.

ISSUE from the register sent to try the question "whether the paper writing purporting to be the last will and testament of Thomas Chandler dec'd., is or is not the last will and testament of Thomas Chandler dec'd."

The will in question bore date the 24th May, 1833, and was made when the testator was in his 73d year of age. It was in the hand writing of Benjamin Ferris, who was constituted an executor and trustee as hereafter mentioned. It contained a great number of small bequests, amounting in the whole to about seventeen thousand dollars, most of which were to the testator's relatives; and it then disposed of the rest and residue of his estate, real, personal and mixed, in the following manner.

"And whereas it hath frequently occurred to my mind that the African race or descendants of African natives in the United States, are in a deplorable degraded condition, and considering that neither the federal government nor any other institution has made adequate provision for their improvement in education, morals and industry I have thought that a great and permanent benefit might accrue, not only to that people but to the white population of our country, if a foundation could be laid, though in a small way, of a *fund* to be appropriated to the promotion of these important ends. With the hope therefore that benevolent individuals who may survive me, may be disposed to aid in this concern, and contribute towards its accomplishment, until a fund may be raised sufficient to commence an *institution* to carry into effect the views before expressed, so far at least as to educate male children of the African race, so as to render them useful to themselves and the community by a course of instruction in morals, science and productive employment, agricultural, mechanical or otherwise; I do hereby give, devise and bequeath to John Clark, now of the, city of Wilmington, in the State of Delaware, Benjamin Ferris and Eli Hilles of the same place, David Wilson, of Hockessing, in the State aforesaid, Jacob Heald and Haines Jackson, of the same place and Bennet Jefferis, of Christiana hundred in the State afs'd. all the rest and residue of my estate, real, personal and mixed or of whatever kind the same may be not herein otherwise disposed of in trust, nevertheless, that they the said John Clark, B. F., E. H., D. W., J. H., H. J. and B. Jefferis and the survivor of them and their successors appointed as herein after directed, shall faithfully appropriate and apply the said residue of my estate or the proceeds thereof, to the purpose afs'd. and to no other. And in order to carry into effect the object of this devise and bequest, I do hereby authorize and empower my executors herein after mentioned, to sell any real estate which I may own at the time of my decease, included in the residue of my estate as afs'd., and by a good and sufficient deed or deeds of conveyance duly executed and acknowledged, to grant and confirm to the purchaser or purchasers thereof, all my estate, right, title and interest in the same, as fully and effectually as I myself could now do, and I do hereby direct my said executors to pay over to my trustees herein named, the net proceeds of all such sales to be by them appropriated as herein before directed.

And in order to prevent any failure of the trust committed to the said John Clark, B. F. &c., I do hereby authorize and empower them and their successors and a majority of them and their successors forever, upon the death, removal out of the State, refusal to serve or total neglect of any one or more of the said trustees or of their successors to appoint another or others to fill his or their places, and the person or

persons so appointed shall have and exercise all the power and authority which is hereby delegated to any one or an equal number of the trustees herein before particularly named.

And it is my will and I do hereby direct that all the estate or proceeds of the estate hereby given in trust to my trustees herein before named and to their successors, shall be as far as practicable kept out upon interest or so invested as to be productive, and that all the interest or net proceeds arising from dividends on stocks or other investments shall be from time to time added to the estate hereby devised or bequeathed, during the space of *seven years* after my death, if the principal shall so long remain unappropriated in the manner aforesaid.

And it is further my will and a condition of the afs'd. devise. and bequest to my trustees as afs'd. that the estate so given to them in trust shall be appropriated and applied to the uses and purposes afs'd. within seven years after my decease; and if within that time no such institution shall be established or commenced, and no other funds raised for the purposes of such establishment, then and in such case all the said residue of my estate shall go to and be equally divided among all the children of my nephews and nieces and their legal representatives, share and share alike, and I do hereby give and beqeath the same to them accordingly, to hold the same, to them and to their heirs and assigns forever. Excepting nevertheless out of such bequest the sum of five hundred dollars, part of the said residue, which I do hereby give and bequeath to the African school society of Wilmington, incorporated by the Legislature of the State of Delaware, for the purpose of instructing the descendants of the people. of Africa,—the same to be paid to the said society on failure of the said institution and not otherwise.

And as it may be useful and proper that I should express my mind in relation to the plan of the institution proposed, I hereby add an outline of such plan as appears to me most likely to attain the object of my concern.

First. That a tract of land should be purchased sufficiently remote from any city, town or village, to prevent all improper intercourse between the resident pupils and every person connected with the institution.

Second. That commodious and substantial buildings be erected thereon for the accommodation of the pupils and officers of the institution, and for workshops, barns, stables and for other purposes.

Third. That children should be admitted at seven years of age and older, as pupils from any section of the United States, but those from the State of Delaware to have the preference in all cases when it may be necessary from the state of the school to make a choice.

Fourth. When pupils arrive at fourteen years of age, having had a competent share of learning to fit them for business, they should be permitted, if they so choose, to be apprenticed to suitable persons at the discretion of the managers, to learn trades, agriculture or other business, in which they may be useful to the community and of advantage to themselves—otherwise they may at the discretion of the managers, be kept on the farm or in the workshops under the care of the institution, until they arrive at the age of twenty-one years.

Fifth. The pupils should be maintained and educated without other charge or compensation than their own labor, and should be found in food and good plain clothing during their residence in the institution.

Sixth. The course of instruction should include reading, writing, arithmetic and English grammar—and where inclination and capacity on the part of the pupils are manifest, the course of instruction should extend to the higher branches, particularly those that may be most useful in practice, such as navigation, surveying and the necessary preliminary acquirements.

Seventh. The managers should have power of course to discourage all improper conduct on the part of the pupils, and to encourage them in their pursuits and for good behavior, by dismissal or punishment in the former case and by rewards or promotion in the latter.

Eighth. The farm ought to be managed in the best manner, and according to the most approved system of agriculture, so as to be a proper model or pattern for others. All the labor should be performed by the students, which should be so regulated that each pupil should do his proper share of labor and have his fair proportion of literary instruction daily.

Ninth. As the funds and resources of the institution may authorize, workshops should be built and mechanics employed to teach the pupils in their several branches, such as smiths, shoemakers, cabinet-makers, turners &c., seeing that the elevation of this class of people much depends on their usefulness as members of the community.

Tenth. Each pupil on admission into the institution, should come under written obligations to remain under the government of the officers or superintendants of the establishment, and to comply with such instructions as may be given them. And it might be advantageous and proper to have legislative authority to bind them out under the age of twenty-one years, to such persons as might be suitable, in order to attain the objects in view as before expressed.

And I desire that at no time more than two of the trustees in future to be appointed, should be resident in the city of Wilmington or any other town—at least five in number should always be inhabitants of the country.''

And he appointed Amor Hollingsworth, Jesse Gregg and Benjamin Ferris, executors.

The estate amounted to between thirty and forty thousand dollars.

*Latimer* for deft. produced the will and proved its formal execution by Samuel Smith, the surviving testamentary witness. The execution took place at the house of Benjamin Ferris, who was a scrivener by profession. This witness gave a very decided opinion as to the sanity of the testator. The idea had never occurred to him, nor had he ever heard it suggested by another, previous to the death of Thomas Chandler, that he was not a man of sound mind.

*Bayard,* then opened on the part of the caveators, stating—

That he should controvert the validity of this will on the ground of incompetency in the testator from general weakness of intellect, operated upon by the improper influence and control of others. It would appear to be the case of a very old man living upon good terms with

58

his family connexions, towards whom he had always manifested great kindness and affection, disposing of a large property, to the exclusion of those relatives, towards a class of people who had in his better days, been objects of his marked aversion, and towards an object which itself presented strong evidence of insanity. That though he was a man of pretty strong mind on some subjects, he was subject to periods of depression amounting almost to insanity; that he was often afflicted by a kind of monomania first on one subject and then on another; and that weakened as he was by age and disease, in the course of which he had had several attacks of palsy, he was peculiarly subject to the management of others. That the deft. acted on this occasion as the counsellor of the testator; and by leading his mind to an object which he and other members of the anti-slavery society had at heart, exercised over him an *undue* influence, and made him substitute their own will for his. Under these circumstances the plffs. would insist that although the extremely weak and vacillating state of mind which they would prove the testator to have been under might not amount to actual *insanity*, there was a degree of influence exercised over him, and a direction given to a mind naturally tending to insanity which ought to satisfy the jury that in this act Thomas Chandler did not exercise a sound and disposing mind.

During the examination of plff.s' witnesses, the following letter was produced by the deft. at the request of the other side, and read in evidence by them with a view to show the extent of influence exerted over testator's mind.

Copy of a letter from William Lloyd Garrison, editor of the Liberator, to Benjamin Ferris.

The first page contained printed "proposals for establishing a school on the manual labor system for the education of colored youth," and a printed plan for such school, in substance similar to the one contained in Chandler's will. The manuscript was as follows:

"BOSTON, Feb. 16, 1833.

Respected Friend;

I presume the enclosed plan for the establishment and government of the manual labor school for colored youth will be acceptable to you and your benevolent friend. The managers of the anti-slavery society deem it unnecessary to urge upon either of you the importance and need of the contemplated school. It is desirable that whatever is done, should be done speedily. Subscriptions have been commenced, in this quarter, under very favorable circumstances. Your friend, we trust, will add his name to the list of donors.

We are cheered in view of the progress of the anti-slavery cause in this country. The example, so long given by the society of friends, is beginning to have its legitimate influence.

Your humble friend,
WM. LLOYD GARRISON.

BENJAMIN FERRIS."

The plffs. having closed their testimony in chief:—

*Latimer* opened the defence in support of the will, and examined a number of witnesses on the subject of the testator's sanity. He also read in evidence the instructions given by Thomas Chandler to Benjamin Ferris for drawing his will. This paper was in the hand

writing of Thomas Chandler. That part of it which relates to the residue of his estate was in the following words:—

"Whereas it has frequently revived in my mind for a considerable time, the degraded and deplorable situation and condition of the African race that is unhappily introduced amongst us, and considering that government, nor any other institutions, make no provisions for their improvement in their education, morals or industry: Therefore I have thought that it might be an advantage to them to lay a foundation (in a small way) of a fund for the abovesaid purposes, with a sincere hope that some philanthropists may feel disposed to add thereto until it amounts to a sum sufficient to be put into operation for the education of the youth of that description so as to render them useful to themselves and to the commuity. Therefor I give and bequeath the reversions and remainder of my estate no totherwise disposed of, for the express purpose of purchasing a plantation or tract of land in a remote part of the country, not near any city, town or village, large enough to support in good degree, the institution by their industry.

The scholars shall be instructed in various branches of a sound and plain education, comprehending reading, writing, grammar and arithmetic, so as to enable them to transact common occurrences of business, if their capacity will admit of it. The farm to be cultivated in the most advantageous manner for the support of the institution— the scholars to work on the farm one half of the day when they can be employed advantageously, or at some mechanick trades, any such as will clear their way or expenses, and the half in the school.

But if no such institution shall be founded within seven years from the time of my decease, then I give the said residue to all the children of my nephews and nieces equally, except 500 dollars to African school society."

The deft. here rested his case.

Joseph Baily, was called as a witness on the part of the caveators and asked in relation to the testator's general state of mind and bodily health.

The testimony was objected to as not being strictly in reply.

The Court said that witnesses might now be examined to contradict or explain any facts stated on the other side, but not generally as in the previous examination. The caveators commenced (after the formal proof of the will) by a general examination tending to show the insanity of the testator; or that he had been subjected to an undue influence in making his will. The other side replied at length as to these matters: Each side therefore has had full opportunity in the general examination to bring out all the evidence on this subject. If either party were permitted again to go into a general examination, the other would have a right to demand a general reply, and there would be no end of the case.

Whereupon both sides closed.

A question arose as to the manner of conducting the argument before the jury.

*Bayard.* This is a new question in this court. The general rule is that the burthen of proof, and not the technical form of the pleadings, gives the opening and conclusion; 1 *Stark. Ev.* 384; 8 *T. Rep.*

497. Ordinarily the plff. has the conclusion for the burthen usually rests with him. But when the pleas are affirmative or the proof shows that the laboring oar is with the other side, the order of proceeding is reversed. The issue sent here is in the usual form, whether the instrument in dispute is the last will and testament of the testator; and where the will is controverted on the ground of fraud or incapacity, the proof of execution is merely formal. The execution of this will was not denied. It rests with us therefore to avoid it on other ground. The law presumes sanity and throws it upon us to prove insanity or other cause for setting aside the will. The order of proceeding heretofore had in the cause shows that by common consent the laboring oar has been assigned to the caveators. They should therefore have the opening and conclusion. And such was the decision in the late supreme court in Kent county, in the case of *Buckmaster's* will and *Cubbage's* will.

*Rogers.* In the case of *Grubb's* will, in this county, and *Masten's* will tried before the present court in Kent, the practice was otherwise. And on principle it should be so. What is the question we are trying? Whether the paper writing purporting &c. is or is not the will of Thomas Chandler. We affirm that it is his will and we have to show it. The burthen therefore is with us. The rule is without exception running through every description of action that the party who has the affirmative of the issue has the right of concluding.

*Clayton.* The pleadings may sometimes throw the burthen of proof without giving the benefit of conclusion. But the pleadings are the party's own act. Here the issue made up is not the act of the party but of the Register; and the court will examine who has really the burthen of proof to make out. In *Masten's* case the question was not raised, and indeed the state of facts was different. The execution of the will was denied. One of the testamentary witnesses was dead and the other very ill at the time of trial. It was doubtful whether the execution could be fully proved. In *Cubbage's* case the question was made; and in *Buckmaster's* case it was twice argued, and the conclusion given to the caveators.

*The Chief Justice* stated his recollection of the practice. He knew of no decision in the common pleas while he was at the bar or on the bench in that court. He recollected three cases in the supreme court in which the opening and conclusion were given to the caveators. He referred to James Robinson's will; to Wilson Buckmaster's, (*a*) and Thomas Cubbage's. (*b*). In all of them the ques-

(*a*) John Bell *vs.* Joseph Buckmaster et al. Supreme Court Kent, 1820; *temp. Johns,* chief justice.

Issue—"Whether Wilson Buckmaster, at the time of making and executing the writing of the seventh January, 1819, was of sound and disposing mind, memory and understanding."

*J. M. Clayton,* for the will.

*Thomas Clayton,* for caveators.

*J. M. Clayton* asked the court's opinion who had the right to open and conclude. The register has made the executor plaintiff.

*Per curiam.* "From the nature of the issue the onus probandi is with the deft. The execution is proved, and the only question is as to the testator's

tion was formally made and decided.   The issue on Grubb's will in this county was not argued, and the question was therefore not raised.   A case has also occurred in Kent, the only one in this court: the case of *Masten* vs. *Anderson et al.* where the executor did open and conclude, but the matter passed sub silentio and the regularity of the proceeding was not called in question.

We are not to be governed by the question who affirms or who denies in the issue; but where is the onus probandi.   The burthen here is upon the caveators; they do not deny the execution of the will, but set up insanity and such an influence exercised by others over the testator's mind as will vitiate the will.   After the formal proof of the paper, the executor might fold his arms until the caveators produced something to overthrow his case which is prima facie established by the production of the will and the inference of law in favor of sanity.   We are of opinion that the caveators have the opening and conclusion.

*Bayard*, for caveators, contended, that if they had not made out a case of actual insanity, they had shown the testator to be a man of exceeding weak intellect; enfeebled both in mind and body by age and disease.   That the will was made under circumstances of strong suspicion, without the knowledge of his relatives, by a person who sustained to him the relation of a counsellor and attorney; a will violating natural affections; contrary to *ascertained* previous determinations; in favor of a class of people towards whom Thomas Chandler was known to have entertained antipathies, and for an object not only wild and visionary, but in our state of society and political condition, wicked in its character and dangerous in its tendency.   In tracing out its consequences, he read from a pamphlet published by William Lloyd Garrison, entitled "Thoughts on African Colonization," with a view of showing his sentiments and those of the anti-slavery society in relation to negro slavery.   He read extracts to prove—First. That the author was in favor of the immediate abolishment of slavery in this country. pp. 58, 59.   Second. That he was not only for emancipation, but insisted on remunerating the slaves for years of unrequited toil and labor, &c. p. 85.   Third.

insanity.   The law presumes sanity until the contrary is proved.   We are of opinion that the defts. have the right to conclude: you may proceed to open as you please."

The jury, not being able to agree, was discharged, and the case was tried over again at a succeeding term, when this question was raised again and argued at some length.   The court decided as before.

(b) John Cubbage *vs.* William Cubbage.   Issue—*devisavit vel non*.
Question made, which party was entitled to open and conclude.
*J. M. Clayton*, for caveators. The burthen of proof is with us, and we have the conclusion.   So decided in Bell and Buckmaster.
*Bates.* This case is not like Buckmaster's.   Here the burthen of proof is with us.   We admit the general derangement of the testator, but contend that the will was made during a lucid interval; and we are to prove it.
*Per curiam.* "The burthen of the proof is with the plff. who relies on insanity.   The law presumes every person to be in his senses, and those who controvert the will must prove insanity.   The plff. is to open and conclude."

That he denied the legal right of any one to hold a slave.    Fourth. That he was for amalgamation. pp. 145-6-7.    Fifth.  For instruction and  subsequent admission to all  the trusts, offices and  honors of the republic. p. 80.    Sixth.  And that he was for a negro college, as the means of effecting these objects.

*Mr. Bayard* insisted that the jury were bound to regard the character of the bequests in forming an opinion of the sanity of a testator, and that a will might contain so absurd and unnatural a disposition of property as to afford sufficient evidence in itself of insanity; and he cited 1 *Cox Ch. cases*, 355; 3 *Merivale* 84; 3 *Eng. Eccl. Rep.*; 1 *Adams Ecc. Rep.* 99; *Evans* vs. *Wright; Shelford on Lunatics*, 174, *in Law Library, Nov.* 1833, 178, *Swinburne on Wills*, 478-9.

*Latimer, Read, jr.* and *Rogers*, contra. The question of the policy or impolicy of the bequest to a negro college is not a subject for the consideration of the jury; they are only to decide whether such was the will of Thomas Chandler.   The jury have before them a paper, regularly executed, which declares that such was his will; and it is admitted that they must so find it to be unless the other side prove that such was *not* his will.  The burthen of proof lies with them.

The proof has totally failed on the subject of insanity.   With the exception of the diseases incident to advanced life, nothing has been proved tending to show even imbecility.   And in relation to these diseases the physicians, whose testimony is to be taken on this subject in preference to the opinions of others, prove that they were not of a character to affect the mind.   The particular disease under which he labored was asthmatic, and not paralytic, as some persons, unskilled in the nature of diseases, have ventured to assert.   He continued to transact his usual business down to and after the date of the will; collecting interest on his bonds, mortgages and stocks; calculating interest and making probates, when necessary; and so late as the month of July, 1833, his deposition was taken by Mr. Gray on a commission from chancery, and he was then considered by the commissioner to have been of perfectly sound mind.   If the testator was of sound mind this will must stand, unless it has been proved to have been made under the operation of an influence counteracting his own purposes and violating his own wishes.   No mere advice or solicitation, no persuasion or argument, will vitiate a will: it must be an importunity, such as the testator is too weak to resist; a degree of solicitation that deprives him of his free agency, and compels him to adopt another man's will for his own. 3 *Stark.* 1707; 2 *Phil. Ev.* 449; 1 *Ecc. Rep.* 340, 344; 2 *do.* 231.    And the procuring a will to be made will not vitiate it, unless fraud has been practised on the testator. 3 *Serj. & Rawle* 267; *Miller* vs. *Miller*.

What evidence is there in this case of any influence whatever having been exerted over the mind of Thomas Chandler, much less of an undue influence?   The jury cannot presume fraud.   Fraud must be proved.  And yet they are called on in this case to presume in the first place, against the evidence, that Thomas Chandler was so weak as to be very liable to imposition; and then to presume that William Lloyd Garrison and the whole anti-slavery society have been engaged in circumventing this old man, to induce him to make

a will contrary to his own wishes. How stands the fact in relation to the testator's previous views? For several years he is proved to have had the amelioration of the condition of the blacks at heart. In his will of 1831 he made a liberal bequest to the African school, and a large one to the Colonization society. But the written instructions for the will of 1833, prepared by himself and written with his own hand forever put at rest any idea of undue influence on the part of Benjamin Ferris or any one else. These instructions are so identical in language in many parts with the will of 1831 as to show that he had that will before him when they were drawn up; and they have been carried out with sufficient accuracy in the will which is now the subject of discussion. 2 *Ecc. Rep.* 219, 269. A legacy in the instructions left out of the will is, not of itself sufficient to invalidate the will.

*J. M. Clayton,* in reply, relied chiefly on the discrepancies between the instructions and the will. He insisted that they were not even in substance the same. The *instructions* directed the disposal of the residue of his estate for the purchase of land on which a *grammar school* should be *founded* by the benevolence of other persons; and if not so founded within seven years, that it should go over to his nephews and nieces. The *will* as drawn disposes of the residue for founding a *college,* and gives it over to the nephews and nieces only in case the said college should not be *commenced* within seven years, and *no other funds raised towards that object.* The instructions were designed to draw out the active benevolence of other individuals in the completion of a project of which Thomas Chandler only offered the foundation, and gave the property to his next of kin in the event of its not being completed within the limited time. The will makes Thomas Chandler not only begin but complete the establishment, and gives the property away from his kindred forever on the subscription of one dollar by any other person to the same object. It is perfectly competent for the trustees under the will, if they see proper, to subscribe every dollar of the residue of this estate to the funds of the anti-slavery society of New England, and, in conjunction with that society, to establish in Delaware, a slave holding state itself and on the borders of the southern slave holding states, an institution that shall forever wage war with their and our institutions, and shall finally overthrow them if it succeeds in its avowed objects.

There is much evidence of imbecility of mind in the testator in this case; but it is not necessary for us to rely on his insanity. He is proved, at least, to have been a man of *fluctuating* capacity. And when the testator's capacity is fluctuating he is not to be considered as absolutely intestable; but to set up such a will there must be evidence of *instructions* and *volition.* 3 *Ecc. Rep.* 260. How stands the proof on that subject? Here are instructions given in writing; a will drawn totally different from them; no proof of the departure from the instructions having been explained to him; no proof that the will was even read over to him; executed privately, in the presence of strangers, and in the house of the executor and trustee and draftsman; under these circumstances we confidently ask the jury to say that the paper now before them is *not* the last will and testament of Thomas Chandler.

*The Chief Justice* charged the jury, (after stating the question and reviewing the evidence,) that if they were of opinion from the evidence that the testator was capable of exercising thought and judgment and reflection; if he knew what he was about, and had memory and judgment, his will could not be invalidated on the ground of insanity. Neither could it be set aside on the ground of undue influence, unless such influence amounted to a degree of constraint such as the testator was too weak to resist; such as deprived him of his free agency, and prevented him from doing as he pleased with his property. Neither advice, nor argument, nor persuasions, would vitiate a will made freely and from conviction, though such will might not have been made but for such advice and persuasion. Another and more material ground of objection to the will is a supposed discrepancy between it and the instructions on which it was founded and from which it was drawn. If the jury are of opinion that these differences exist to such an extent as to make the will essentially different from the instructions, they must then judge from the evidence whether these deviations were made with the knowledge and consent of the testator. If they were not made known to him, if the will was not read over, or its contents and variations from the instructions otherwise explained to him, then this is not his will; but if he knew of and approved the alterations he adopted them by the execution of the will, and the same ought to be confirmed.

Verdict setting aside the will.

*J. A. Bayard* and *J. M. Clayton,* for caveators.
*Latimer, Read, jr.* and *Rogers,* for executors.